AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>FAYE HSIN-I KU | DOCKET NO.<br>**16-0299M**<br><br>MAGISTRATE'S CASE NO. |

Complaint for violation of Title 18, United States Code, Section 1204(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>August 29, 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1204(a)]

On or about August 29, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant FAYE HSIN-I KU, with the intent to obstruct the lawful exercise of parental rights of another, removed from the United States, and retained outside the United States, the following children who had not attained the age of 16 years: S.P.C. and I.E.C.

LODGED

2016 FEB 12 PM 1:41
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED
CLERK, U.S. DISTRICT COURT
FEB 12 2016
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MARK F. MATTHEWS**<br><br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1)<br><br>SUZANNE H. SEGAL | DATE<br>February 12, 2016 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 4

AUSA Christopher C. Kendall x2576        REC: Detention

## AFFIDAVIT

I, Mark F. Matthews, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 1995.  I am currently assigned to the FBI Los Angeles Division Long Beach Resident Agency violent crime squad which has investigative responsibility for the investigation of violent crimes including gangs, kidnappings, extortions, crimes against children, and organized crime drug enforcement investigations. I am a law enforcement officer currently authorized to investigate and enforce violations of federal criminal statutes, including those found in Title 18 and 21 of the United States Code.  I have received basic law enforcement training at the 16-week FBI Academy, which focused on various aspects of conducting criminal enterprise investigations such as interviewing and interrogation techniques, physical and electronic surveillance, development and management of confidential human sources, and arrest planning and execution.  While employed by the FBI, I have investigated many violent crime matters including parental kidnappings, bank robberies, gang investigations, and narcotics trafficking violations.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, FAYE HSIN-I KU ("KU")

for a violation of 18 U.S.C. § 1204(a) (International Parental Kidnapping).

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

4.     According to an investigation conducted by FBI SA Caryn Highley in the Seattle Division of the FBI, on or about August 29, 2015, KU kidnapped her minor children when she did not return them to her ex-husband and the children's father, David Leonard Cook ("Cook"), after the children's trip to California, in violation of a court-ordered parenting plan; rather, KU took the children to Mexico.  As described below, in order to facilitate the kidnapping, KU forged the signature of the visitation supervisor; withdrew approximately $15,300 from her bank account; and had someone drive her and the children to the California/Mexico border.  Furthermore, prior to taking the children to Mexico, KU left a note in her home addressed to Cook, in which she made threatening statements; told her cousin that she was dissatisfied with her child visitation agreement and desired to take the children out of the country to Mexico;

2

and told her ex-boyfriend that she was thinking about "taking off" with the children to Mexico. Subsequent investigation has revealed that KU has applied for Taiwanese passports for the two children in Mexico City. On February 11, 2016, I learned that Mexican immigration officials had taken KU, S.P.C., and I.E.C. into custody, and that all three were found to be in possession of Taiwanese passports.

## IV. STATEMENT OF PROBABLE CAUSE

5.    From February 9 through February 12, 2016, I have communicated with FBI SA Highley who provided me with all of the information in this affidavit (unless otherwise noted).

### A.    Background and Prior Kidnapping Attempt

6.    Based on FBI SA Highley's review of Bellevue, Washington Police Department ("BPD") reports, she learned the following:

a.    S.P.C. and I.E.C. are the minor sons of Cook and KU, who are currently divorced. S.P.C. is 15 years old, and I.E.C. is 9 years old. Cook and KU were married from January 1998 to October 2008. After their divorce, a parenting plan was put in place in Washington State. KU is a United States citizen born in Taiwan.

b.    In August of 2012, KU, who had been the primary custodial parent of S.P.C. and I.E.C., notified Cook that she would be moving out of the state and leaving the children in his care. Accordingly, Cook took over the primary care of S.P.C. and I.E.C. in September of 2012. Between August of 2012 to present, S.P.C. and I.E.C. visited KU in Texas, New Mexico, and

3

California. Cook petitioned for a modification of the parenting plan based on the new living arrangements, but KU was non-responsive.

      c. In May of 2013, KU moved to Taiwan. At that time, KU was pregnant with a third child, later named Z.K. Although Cook is S.P.C.'s and I.E.C.'s biological father, he is not Z.K.'s biological father. KU asked Cook to allow S.P.C. and I.E.C. to live with her in Taiwan for the summer of 2013, but Cook told KU that he would not agree to that arrangement until a new parenting plan was in place.

      d. On June 11, 2013, KU attempted to take S.P.C. and I.E.C. to Taiwan without Cook's knowledge. KU applied for and obtained United States passports for S.P.C. and I.E.C. without Cook's knowledge. KU then flew from Los Angeles International Airport ("LAX") to Seattle, Washington, removed the boys from school, went to the Seattle-Tacoma International Airport ("SEA"), and purchased one-way plane tickets to Taiwan for her and the children. KU, S.P.C., and I.E.C. then boarded their flight to Taiwan, but were removed by the Port of Seattle Police before departure. KU was arrested on state charges for custodial interference in the second degree, based on her violation of the parenting plan. S.P.C. and I.E.C. were returned to Cook, and KU was later allowed to travel to Taiwan on a different flight.

      e. On August 18, 2013, the King County Superior Court issued a Temporary Parenting Plan and a Restraining Order.

4

S.P.C. and I.E.C. were placed with their father, Cook, and professional supervision was required for future visits with KU.

   **B.    The Current Parenting Plan**

   7.    Based on FBI SA Highley's review of BPD reports and a court-ordered parenting plan, she learned the following:

        a.    In May of 2014, KU moved from Taiwan to California with Z.K.  In December of 2014, Cook and KU went to trial to modify the parenting plan for S.P.C. and I.E.C.  The current Parenting Plan, No. 08-3-07572-2 SEA (attached and incorporated by reference herein as Exhibit 1), was signed and put in place on December 8, 2014, by the Superior Court of Washington County of King ("the Court").  In this plan, the Court identified the basis for the restrictions placed on KU:

> The cumulative effect of Petitioner's demonstrated
> propensity to deceive Respondent and others to pursue
> her own interests; her willingness to leave her
> children for extended periods of time; her lack of
> insight into the effect of her actions on others,
> particularly her children; and her history of
> violating court orders (i.e., disregard of the
> parenting plan when she attempted to take the children
> to Taiwan in 2013 without Respondent's knowledge;
> being held in contempt in October 2010 for
> unilaterally making a serious education decision (home
> schooling without Respondent's agreement) create a
> situation that has an adverse effect on the best
> interests of her children under RCW 26.09.191(3)(g).

b.    The Final Parenting Plan made Cook the main custodial parent, stating in paragraph 3.12:

> The children named in this parenting plan are scheduled to reside the majority of the time with the father. This parent is designated the custodian of the children solely for purposes of all other state and federal statutes which require a designation or determination of custody.

c.    The Final Parenting Plan also established the limits on KU's visits with the children. In the section of the Plan titled "III. Residential Schedule", the Plan gave KU monthly supervised visitation rights for up to three consecutive days. Specifically, the Plan stated the following:

> The children shall reside with the mother once per month for 2 – 3 days per visit (3 days if the visit does not require the children to miss school), alternating between mother's location and father's location. Visits shall be supervised by a professional supervisor or other neutral adult mutually acceptable to father and mother. Visits may include overnights if a suitable supervisor is available, but may not include overnights if a suitable supervisor is not available. If there is no overnight, the visit shall begin at 9 a.m. and end by 8:00 p.m., if no school. If school, the visit shall begin at the end of the school day and end by 8:00 p.m.. The mother may schedule additional visits in the father's location with

advance written notice of 30 days and father's
agreement. During the children's residential time with
both parents, reasonable efforts shall be made to
ensure the children attend their regularly scheduled
activities.

A visitation supervisor, whether professional or lay,
shall sign an oath of supervision, and shall report
promptly to the parents his/her record of the visit
upon its conclusion. The costs of a professional
supervisor shall be shared proportionally by the
parents.

**C.   KU Kidnaps the Children**

8.     Based on FBI SA Highley's review of BPD reports, she
learned the following:

a.     On August 28, 2015, Cook took S.P.C. and I.E.C.
to the SEA airport in the Western District of Washington and
stayed with them until they boarded their flight to LAX to visit
KU.  At the time, KU's residence was located at 21125 Violeta
Avenue in Lakewood, California ("KU's residence").  Cook
received a text message from S.P.C.'s cell phone later that
night stating that they had arrived safely in California.  Cook
had been told that the monitor for this visit was Xiaoyu Li
("Li").

b.     On August 30, 2015, S.P.C. and I.E.C. were
scheduled to arrive back in Seattle, Washington at 9:00 p.m., on
Alaska Airlines flight 461.  That night, Cook went to SEA
airport to pick up S.P.C. and I.E.C., but neither got off their

scheduled flight. When Cook inquired about them, an Alaska Airlines representative told him that S.P.C. and I.E.C. had not been on the flight and their tickets had been canceled because they failed to check-in.

c.    Cook then attempted to call KU, S.P.C., and Li. Cook was unable to make contact with any of them and contacted BPD where a police report was taken. Later on August 30, 2015, Sheriff Deputies from the Los Angeles County Sheriff's Office ("LASO") went to KU's residence and knocked on the door. There was no answer.

## D.    State Search Warrant and Letters to Cook

9.    Based on FBI SA Highley's review of BPD and LASO reports, as well as a review of items found during the execution of California State search warrants, she learned the following:

a.    On August 31, 2015, Cook, still having no contact with KU or his children, called the LASO and asked for a second welfare check of KU's residence. LASO deputies went back to the residence and, while they were there, KU's landlord and personal friend, Richard Pan ("Pan"), made contact with them. Pan and the LASO deputies went up to the house and knocked on the door, but no one answered. They walked around the house, but did not notice anything unusual. However, they saw KU's vehicle parked in the garage. Deputies found a sliding glass door to the residence unlocked, opened the door, and verbally identified themselves as police. They received no response to their announcement so they entered the home and looked around inside for any individuals. They found no one home. During the

8

welfare check inside KU's residence, the LASO deputies saw several electronic devices throughout the residence. After determining no one was in the house, Pan secured the residence, and the LASO deputies left.

      b.    On September 1, 2015, LASO obtained California State search warrants for KU's residence and KU's 2002 Volvo, which had been seen parked in the garage of KU's residence. During the execution of the search warrants, LASO deputies located the following items: KU's cellular phone, KU's California driver's license, S.P.C.'s cellular phone, an iPad, and S.P.C. and I.E.C.'s laptops, and other personal items.

      c.    LASO deputies also found four letters addressed to Cook, Pan, KU's mother, and one to KU's step-mother and her father (attached and incorporated by reference herein as Exhibit 2). In the one page, typed letter addressed to Cook, KU confirmed that she had the children and warned Cook not to send "strangers who can only make life more dangerous for us." She then included an internet link to a story about a father who called the police after his son stole the family car and was subsequently shot and killed by the police. KU's letter then reminded Cook that she had told him that "it is not about the judgment of a court. It will always be about the judgment of the children." The letter stated the children are only "a phone call and flight away" and that "their safety includes the safety of their mother and brother" (i.e., KU and her son Z.K.). At the end of the letter, KU wrote, "we will ask our lawyer friends to check when it will be safe to return. It is your job now to

make it as safe for us as possible, and we will be watching. If you continue down this path of destruction, it will only end in more tears for everyone, and something unforgivable may happen."

        d.   The letter to Pan indicated that he had been a father figure to her. In Pan's letter, KU advised him that she had assigned him as her power of attorney and included detailed instructions about what should be done with her banking accounts and belongings, including her Volvo. The letters to "mom" and "mom and dad" stated she loved them.

        **E.   Forgery of Li's Signature**

        10.   Based on FBI SA Highley's review of LASO reports, she learned that, on August 31, 2015, LASO Deputies located the visitation supervisor, Li. Li informed the LASO Deputies that he went to LAX on August 28, 2015 with KU to pick up S.P.C. and I.E.C. After S.P.C. and I.E.C. got off flight, Li signed an Alaska Airlines form taking custody of the children with KU. Li helped KU and the three children out to KU's 2002 Volvo. Li said that was the last time he had contact with any of them. At the conclusion of the interview, LASO deputies showed Li a copy of the "Agreement and Oath of Visitation Supervisor," an official court document detailing the rules and conditions of supervised visitations and the responsibilities of the visitation supervisor. The document had Li's name, signature, and contact information on it. Li told investigators he had never seen the document, he had never signed it, and the signature on the document was not his. LASO deputies compared the signature on Li's California driver's license to the one on

the "Agreement and Oath of Visitation Supervisor" document, and the signatures appeared completely different.

### F.     Interagency Investigation

11.     Based on FBI SA Highley's review of LASO reports, she learned that, on September 2, 2015, FBI Los Angeles Field Office ("LAFO") Supervisory Special Agent ("SSA") Joseph Brine provided LASO Detective McNichols with international flight information for KU, S.P.C., I.E.C., and Z.K.  Record checks showed that KU, S.P.C., I.E.C, and Z.K., were not scheduled and did not take an international flight.

12.     Based on FBI SA Highley's review of BPD reports, she learned the following:

     a.     On September 3, 2015, the King County Superior Court charged KU with custodial interference in first degree for violation of Revised Code of Washington ("RCW") 9A.40.060 and issued a warrant for her arrest.  Additionally, KU was reported to the National Crime Information Center ("NCIC") as a missing person and considered an "International Flight Risk."  Both S.P.C. and I.E.C. are also entered into NCIC as missing.

     b.     On September 8, 2015, BPD Detective Shearer reached out to Secret Service SA John Keaveney to see if they could provide any information regarding KU, S.P.C., I.E.C, and Z.K. entering Taiwan.  On September 9, 2015, United States Secret Service SA Keaveney sent an email stating, "Taiwan authorities have no record of her or the kids entering."

     c.     On September 10, 2015, King County Deputy Prosecuting Attorney Maureen Galloway informed BPD Detective

Neff that a Red Notice for KU and Yellow Notice for S.P.C. and
I.E.C. had been submitted to Interpol. In addition, Galloway
reached out to United States Marshal Service ("USMS") SA Derrick
McCauley to see if he could provide any information regarding KU
and her three children leaving the country. USMS SA McCauley
sent an email that stated Immigration and Customs Enforcement
("ICE") had no record of KU leaving the country.

> **G.    Interviews of Cook**

13. Based on FBI SA Highley's discussions with her
supervisor, SSA Carolyn Woodbury, she learned the following:

a.    On September 21, 2015, FBI SSA Woodbury and SA
Steven Vienneau met with BPD lead investigators, Cook, and Helen
Cook (the step-mother to S.P.C and I.E.C.). At this time, Cook
informed investigators that he had learned from a close friend's
contact within the Taiwanese Consulate that KU had applied for
Taiwan-issued passports for S.P.C. and I.E.C., but that the
request had been denied on August 13, 2015, due to KU not having
all the proper documentation, including approval from the
children's father (Cook).

b.    On September 24, 2015, SSA Woodbury and SA
Highley met with Cook and Helen Cook to discuss the ongoing
case. During this interview, Cook stated that, in 2013, when KU
first attempted to kidnap the children and travel to Taiwan, she
had applied for and successfully obtained United States
passports for both children without Cook's consent. Cook
currently has both S.P.C.'s and I.E.C.'s United States passports
in his possession, but Cook explained that he had been concerned

KU had obtained Taiwanese passports for the children.  On September 2, 2015, Cook and Sheng Wang (the mother to one of I.E.C.'s friends), went to the Taipei Economic and Cultural Office ("TECO") in Seattle and spoke with Director Chen-Chi Wu ("Wu"), who told them neither S.P.C. nor I.E.C. had Taiwanese passports issued to them.  On or about September 9, 2015, Wu notified Cook via email that KU had applied for Taiwanese passports for S.P.C. and I.E.C., but KU's request had been denied in August 2015. On October 13, 2015, SA Vienneau and TFO Carver confirmed this with the TECO in Seattle, Washington.

        c.    Cook informed SSA Woodbury and SA Highley that on July 31, 2015, KU had proposed Randal Chen ("Chen") as the visitation supervisor for S.P.C.'s and I.E.C.'s visit to California on August 28-30, 2015.  On August 13, 2015, KU received notice that S.P.C. and I.E.C. were denied Taiwanese passports.  On August 15, 2015, KU texted Cook to tell him that Randal Chen could no longer serve as visitation supervisor, but that her friend, Li, would take his place.  Then, on August 24, 2015, KU sent Cook the "Agreement and Oath of Visitation Supervisor" with Li's forged signature.  Additionally, after the children went missing, Cook learned KU had provided him with an incorrect phone number and address for Li.

    H.    **Facebook Investigation**

    14.  Based on FBI SA Highley's review of data provided by Facebook in response to a Washington State search warrant and from her review of BPD reports, she learned the following:

a.    On September 18, 2015, BPD Detective Rachel Neff obtained a Washington State search warrant for the Facebook account of "FAYE KU."  Detective Neff provided a copy of the Facebook search warrant results to SA Highley.  On September 26, 2015, SA Highley reviewed the Facebook information and found numerous messages between KU and another user named Jimmy Fei ("Fei").  In a conversation dated July 1, 2015, KU told Fei that she may have to move because she could not afford rent.  KU told Fei that she thought she should "either move back to Taiwan or go travel the world."  In fact, KU stated she was "very happy" in Taiwan, referring to her previous stay in 2013 when her child Z.K. was born, and "would have continued to do so, if David [Cook] wasn't holding the kids hostage."  KU told Fei how inexpensive it is to live in Taiwan when compared to living in the United States, and that her father wanted to move back there, as he already had an apartment there.

15.  SA Highley observed the following conversations during her review of the Facebook search warrant information between KU and Joshua Dent ("Dent"), dated July 30, 2015:

a.    At approximately 11:51 a.m., KU wrote to Dent: "Hey... um, can I come with my three kids?? :D"

b.    At approximately 11:52 a.m., Dent responded to KU: "When does this thing start and end?"

c.    At approximately 1:03 p.m., KU responded to Dent: "Sure.  Kids are great labor ;)  I am figuring out who is interested now.  Then I will give you a time frame?"

16. Using an online website for mapping IP addresses, SA Highley searched the IP addresses associated with Dent, and both addresses came back to locations within the country of Taiwan. Based on the conversation between Dent and KU, it appears KU was planning to travel with her three children to visit Dent in Taiwan at some undetermined date.

I. **Bank Investigation**

17. On September 29, 2015, SA Highley was told by a Charles Schwab representative that KU accessed her accounts using online banking services. The representative stated KU last logged into her account on July 28, 2015. On August 7, 2015, KU closed her Investment Retirement Account ("IRA") and individual checking account with Charles Schwab, transferring the remaining balance of accounts into a CitiBank account.

18. Later on September 29, 2015, SA Highley spoke with a CitiBank representative who stated over the telephone that the last time KU accessed her CitiBank account online was August 25, 2015. The CitiBank representative also told SA Highley that from August 7 to August 25, 2015, KU withdrew a total of $15,300.00 in cash.

J. **Telephone Records**

19. On September 24, 2015, Detective Neff provided KU's and S.P.C.'s telephone records for the period of December 8, 2014 to September 18, 2015, which had been obtained pursuant to a Washington State search warrant, to SA Highley, who analyzed the telephone records and public source databases and identified Jacquline A. Trent, Chen, Kelly E. McClenon, Quenton Segal

15

("Segal"), and Vince Baynard ("Baynard") as some of KU's most frequent contacts prior to August 28, 2015.

20.   Based on FBI SA Highley's review of an FBI report of interview, she learned that, on October 22, 2015, FBI Special Agents from the Milwaukee Division interviewed Chen at his residence in Fort Atkinson, Wisconsin.  According to Chen, KU and Chen are distant cousins who met as children, but did not reconnect until a few years ago.  Over the last couple of years, KU and Chen have talked frequently on the phone and through social media.  During their conversations, KU talked a lot about her dissatisfaction with her child visitation arrangements and her desires to take her children, S.P.C. and I.E.C. from their father.  KU told Chen about her plans to take S.P.C. and I.E.C. out of the country and that she was in the process of getting Taiwanese passports for the children.  When Chen was asked where he thought KU would go with the children, Chen said Mexico.

21.   On October 23, 2015, BPD Detective Neff provided a copy of Washington State search warrant return for KU's and S.P.C.'s Gmail accounts to SA Highley, who, upon review of the records, found an email dated July 24, 2015, from KU's Gmail account to loenbest@gmail.com, in which KU asked, "How do I purchase fake ID's?  Thanks, Faye Ku."  On July 25, 2015, KU received a response from loenbest@gmail.com detailing the type of fraudulent identification they could produce.  At the end of the email, the writer stated, "we can produce you the fake id you need but first you will need to tell us which country's id you want ok so we can tell you the cost and requirements. . . ."

16

On July 27, 2015, loenbest@gmail.com sent another email to KU
that was identical in content to the email sent on July 25,
2015.  It is unknown whether KU obtained any fraudulent
identification from loenbest@gmail.com, because no additional
communication between the writer and KU was found in her email
account.

22.  Based on FBI SA Highley's review of an FBI report of
interview, she learned that, on November 20, 2015, Los Angeles
FBI SAs Allan Mackins and Jonathan Bauman interviewed Segal.
Between December of 2014 and August of 2015, Segal spent over
4.5 hours on the telephone with KU.  Segal and KU had known each
other for 14 years, and, after KU's divorce from Cook, they
gradually became romantically involved.  Segal and KU broke up
approximately four years ago but remained close friends.  In
August of 2015, KU told Segal that she was thinking about
"taking off" with her children and that she wanted to run away
with them.  Segal knew the children were coming to visit in late
August and told KU many times during their conversation not to
take off with the children.  Investigators asked Segal where KU
mentioned she would go with the boys.  Initially, Segal could
not remember but later recalled KU mentioned Mexico.

23.  Based on FBI SA Highley's review of FBI reports of
interview of Baynard, she learned the following:

a.  On January 7 and 8, 2016, Los Angeles FBI Special
Agents Tanaz Korami and Craig Oliphant interviewed Baynard.
Baynard and KU spent over 8.5 hours on the phone from December
of 2014 to August of 2015, and exchanged a total of 93 text

messages.   Baynard stated that he remembered that the last time
KU called him, KU had asked if he would be willing to drive her
and her children to Mexico to have dental work done.   Baynard
agreed.   Baynard drove KU, S.P.C., I.E.C. and Z.K. in KU's 2002
Volvo to the border between California and Mexico and dropped
them off there.   Baynard recalled that KU and her children had
backpacks and a couple bags with them, enough for what he
thought was a couple days' stay in Mexico.   Baynard asked KU why
she was not taking her cell phone with her, and KU stated she
was "afraid of losing" her phone.

> b.    According to Baynard, Baynard drove KU's vehicle
to the border because he did not have a vehicle himself.   The
morning before Baynard drove to the California/Mexico border, KU
picked him up at his residence in Pasadena, California and
brought him to KU's residence.   Baynard said that after KU
dropped him off, KU then drove to LAX and picked up S.P.C. and
I.E.C. before returning to KU's residence with S.P.C. and I.E.C.
The following day, Baynard, KU, and Ku's children woke early in
the morning and began driving to the California/Mexico border.
During the drive, Baynard asked KU if it was okay for her to
take the boys (referring to S.P.C. and I.E.C.) to Mexico, and
she showed him several papers with what appeared to be a notary
stamp on them.   Baynard was driving so he was unable to
thoroughly examine the documents.

> c.    Baynard also told investigators he could not
recall the exact dates when he drove KU and her three children
to the Mexico border but knew it was the last time he had

18

contact with KU.  Baynard stated KU called him several days
prior to their trip to ask if he was available.  Baynard said he
dropped KU and the children off as close to the border as
possible so they could walk across, and he has not heard from KU
since.

24.  Based on SA Highley's analysis of KU's phone records,
she concluded the Baynard dropped KU at the border of Mexico on
Saturday, August 29, 2015, a day before S.P.C. and I.E.C. were
scheduled to travel back to their father in Seattle, Washington.

25.  Based on SA Highley's analysis of KU's telephone
records, she further determined that Baynard and KU had numerous
contacts prior to August 28, 2015, the date that S.P.C. and
I.E.C. arrived in California.  Therefore, there is reason to
believe that the days Baynard referred to in the paragraphs
above are, in fact, August 28, 2015 and August 29, 2015.
Additionally, based on information obtained later in the
investigation (which is discussed below), after Baynard dropped
KU off at the Mexican border, I believe that KU illegally
crossed the border from California into Mexico with S.P.C.,
I.E.C., and Z.K.  Numerous checks were done to determine whether
KU, S.P.C., I.E.C, and Z.K., had entered Mexico under their
official names, however no record has been located to confirm
their crossing.  Based on my training, experience and KU's
previous inquiries concerning obtaining false identification
documents, there is reason to believe that KU and her children
entered Mexico using false identities and/or had assistance of a
third party.

19

26. On January 28, 2016, SA Highley received a call from Cook, Helen Cook, and Sheng Wang ("Wang"), and they informed SA Highley that Wang called the Taiwanese Economic and Cultural Office ("TECO") in Mexico City to determine if KU had requested Taiwanese passports for S.P.C. and I.E.C. The TECO representative spoke with Wang in Mandarin and told her KU came into the office with S.P.C. and I.E.C. and applied for passports for the two children, however, those documents were not issued because KU did not have written authority from the father of the children. Wang asked for copies of the passport applications, but was unable to obtain them.

27. On January 29, 2016, SA Highley, along with Wang, Cook, and Helen Cook, called the TECO in Mexico City. Wang, speaking Mandarin, talked with the same TECO representative she spoke with the previous day and learned that the TECO representative had sent several emails to KU requesting written approval from the children's father. KU never responded to the TECO emails. The TECO representative could not release the Taiwanese passport applications for S.P.C. and I.E.C., but stated that the phone number and address KU listed on the applications did not correspond to Mexico City, but to another state in Mexico.

28. On February 2, 2016, SA Highley received a phone call from Cook who stated he and Helen Cook had gone to the TECO in Mexico City in an attempt to obtain copies of the Taiwanese passport applications for S.P.C. and I.E.C. Cook stated that he was unsuccessful in obtaining copies; however, he was able to

see a partial address on the applications with Mazatlan, Sinaloa listed.  SA Highley provided the city (Mazatlan) and state (Sinaloa) information to the FBI Legal Attache ("LEGAT") in Mexico City.

29.  On February 9, 2016, SA Highley told me that FBI LEGAT Mexico City resources had conducted surveillance of a residence in Mazatlan, Mexico, and observed KU in front of that residence.

30.  On February 11, 2016, I learned that Mexican immigration officials had taken KU, S.P.C., and I.E.C. into custody, and that all three were found to be in possession of Taiwanese passports.

31.  On February 11, 2016, I learned that KU and Z.K. are going to be deported to the United States on Alaska Airlines flight 232 from Mazatlan, Mexico, which is scheduled to arrive at LAX at 5:43 p.m. on February 12, 2016.

## V.  CONCLUSION

32.  For all the reasons described above, there is probable cause to believe that KU has committed a violation of 18 U.S.C. § 1204(a) (International Parental Kidnapping).

Mark F. Matthews, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this 12 day of February, 2016.

UNITED STATES MAGISTRATE JUDGE
SUZANNE H. SEGAL

21

# Exhibit 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Superior Court of Washington
## County of King

| | |
|---|---|
| In re the Marriage of: | No. 08-3-07572-2 SEA |
| FAYE HSIN-I KU, | **Final Parenting Plan** |
| Petitioner, | **(PP)** |
| and | |
| DAVID LEONARD COOK, | |
| Respondent. | |

This final parenting plan is entered pursuant to an order on modification/relocation filed on this date.

It Is Ordered, Adjudged and Decreed:

## I. General Information

This parenting plan applies to the following children:

| Name | Age |
|---|---|
| S█ C█ | 13 |
| I█ C█ | 8 |

## II. Basis for Restrictions

**2.1    Parental Conduct (RCW 26.09.191(1), (2))**

Does not apply.

**2.2    Other Factors (RCW 26.09.191(3))**

See ¶ 2.3 of the Order on Modification/Relocation entered on this date, incorporated herein by reference.  The cumulative effect of Petitioner's demonstrated propensity to deceive Respondent and others to pursue her own

*Parenting Plan (PPP, PPT, PP)) - Page 1*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

interests; her willingness to leave her children for extended periods of time; her lack of insight into the effect of her actions on others, particularly her children; and her history of violating court orders (*i.e.*, disregard of the parenting plan when she attempted to take the children to Taiwan in 2013 without Respondent's knowledge; being held in contempt in October 2010 for unilaterally making a serious education decision (home schooling) without Respondent's agreement) create a situation that has an adverse effect on the best interests of her children under RCW 26.09.191(3)(g).

## III.  Residential Schedule

**3.1**   **Schedule for Children Under School Age**

Does not apply.

**3.2**   **School Schedule**

Upon enrollment in school, the children shall reside with the father except as follows:

Until it is determined the mother is not a flight risk and is able to provide a stable, supportive environment for the children, as provided in ¶ 3.10:

> The children shall reside with the mother once per month for 2 - 3 days per visit (3 days if the visit does not require the children to miss school), alternating between mother's location and father's location. Visits shall be supervised by a professional supervisor or other neutral adult mutually acceptable to father and mother. Visits may include overnights if a suitable supervisor is available, but may not include overnights if a suitable supervisor is not available. If there is no overnight, the visit shall begin at 9:00 a.m. and end by 8:00 p.m., if no school. If school, the visit shall begin at the end of the school day and end by 8:00 p.m. The mother may schedule additional visits in father's location with advance written notice of 30 days and father's agreement. During the children's residential time with both parents, reasonable efforts shall be made to ensure the children attend their regularly scheduled activities.

> A visitation supervisor, whether professional or lay, shall sign an oath of supervision, and shall report promptly to the parents his/her record of the visit upon its conclusion. The costs of a professional supervisor shall be shared proportionally by the parents.

> In the event the parties are unable to agree on the standard monthly residential schedule, the mother's proposal should be followed in the father's location and the father's proposal should be followed in the mother's location.

> Once it is determined the mother is not a flight risk and is able to provide a stable, supportive environment for the children, as provided in ¶ 3.10, the

*Parenting Plan (PPP, PPT, PP)) - Page 2*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

1    children shall reside with the mother as provided above, but without the
     requirement of supervision.  Once allowed, visitation with mother as
2    provided in ¶¶ 3.3 – 3.8 shall count as the regular monthly visitation, and
     shall not be in addition to that visitation unless expressly agreed to by the
3    father.

4    **3.3    Schedule for Winter Vacation**

5        Same as the school year, ¶ 3.2, until the mother no longer has supervised
     visitation.  After supervised visitation is no longer required, in odd-numbered years
6    the children shall reside with the father from the day after school ends for the
     vacation until mid-day December 26, and with the mother from mid-day December
7    26 to 5:00 p.m. the Sunday before school resumes.  In even-numbered years, the
     schedule shall reverse, with the mother in the first half of the vacation and with the
8    father in the second half.

9    **3.4    Schedule for Other School Breaks**

10       Same as the school year, ¶ 3.2, until the mother no longer has supervised
     visitation.  After supervised visitation is no longer required, in odd-numbered years
11   the children shall reside with the father during spring break and with the mother
     during winter break (assuming the school observes one).  In even-numbered years,
12   the schedule shall be reversed, with the father for winter break and the mother for
     spring break.  The break begins the day after school ends for the break and ends
13   by 5:00 p.m. the day before school resumes.

14   **3.5    Summer Schedule**

15       Beginning in 2016, or when supervised visitation is no longer required for the
     mother if later than 2016, each parent may have up to three weeks of residential
16   vacation time with the children, which may be taken consecutively or in a minimum
     of 7 day increments.  Parents are to notify each other in writing no later than May 1
17   of their preferred weeks of vacation.  In the event of a conflict, the mother's
     preference shall prevail in odd-numbered years, the father's shall prevail in even-
18   numbered years.  In all years, the children shall reside with the father for a
     minimum of five overnights before the first day of a new school year.
19
         When scheduling vacation time, the parents should take into consideration the
20   children's summer activities and commitments so as not to prevent them from
     participating in activities important to them.
21
     **3.6    Vacation With Parents**
22
         See ¶ 3.5.
23
     **3.7    Schedule for Holidays**
24
         Same as the school year, ¶ 3.2, until the mother no longer has supervised
25   visitation.  When scheduling residential time with the mother, effort should be made

*Parenting Plan (PPP, PPT, PP)) - Page 3*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

to coordinate around a non-school day, including the holidays listed below.

|  | With Petitioner | With Respondent |
|---|---|---|
| New Year's Day | See ¶ 3.3 | See ¶ 3.3 |
| July 4 | See ¶ 3.5 | See ¶ 3.5 |
| Thanksgiving* | Even | Odd |
| Christmas Eve | See ¶ 3.3 | See ¶ 3.3 |
| Christmas Day | See ¶ 3.3 | See ¶ 3.3 |
| Memorial Day | Every | |
| Labor Day | | Every |

Thanksgiving shall begin after the children's school is dismissed before the holiday and end no later than 5:00 p.m. the day before school resumes.

**3.8    Schedule for Special Occasions**

Same as the school year, ¶ 3.2, until the mother no longer has supervised visitation, unless it can be arranged within the terms of ¶ 3.2. After supervised visitation is no longer required.

|  | With Petitioner | With Respondent |
|---|---|---|
| Mother's Day | Every | |
| Father's Day | | Every |

A special occasion shall begin at 10:00 a.m. and end at 7:00 p.m. unless otherwise agreed by the parents.

**3.9    Priorities Under the Residential Schedule**

Paragraphs 3.3 - 3.8, have priority over paragraphs 3.1 and 3.2, in the following order:

Rank the order of priority, with 1 being given the highest priority:

| | | |
|---|---|---|
| __2__winter vacation (3.3) | __4__ holidays (3.7) | |
| __3__ school breaks (3.4) | __6__special occasions (3.8) | |
| __5__summer schedule (3.5) | __1__school schedule (3.2) | |

**3.10    Restrictions**

Pursuant to ¶ 2.2, Petitioner's residential time with the children shall be supervised as provided in ¶ 3.2 until at least December 1, 2015. Thereafter, if the parties agree the mother no longer presents a flight risk and is able to provide a stable, supportive environment for the children, the requirement of supervised visitation with the mother shall end. If the parties do not agree, they shall submit the issue to dispute resolution as provided in Section V.

**3.11    Transportation Arrangements**

Transportation costs are included in the Child Support Worksheets and/or the Order of Child Support and should not be included here.

Transportation arrangements for the children between parents shall be as follows:

Until the mother no longer has supervised visitation, the children shall be transported by car only by a qualified professional or lay supervisor, the father, or an adult authorized by father, who is licensed, insured, and has appropriate child restraints. After supervised visitation with the mother is no longer required, the parents or a licensed and insured adult authorized by the parents may transport the children by car.

Until supervised visitation with the mother is no longer required, the children shall travel by airplane with an adult escort authorized by father. As permitted by airline regulations and with the father's approval, the children may fly unaccompanied to and from the airport closest to the parent's location. The parent who has the children at the beginning of the exchange shall deliver the children to the departing airport in sufficient time for the children to catch their flight without difficulty.

If possible, airline travel shall be reserved at least 14 days in advance, and shall not include red-eye or overnight flights. The mother shall make her travel arrangements when coming to Washington. When the children travel to the mother's location by air, the father shall make reservations for the children and an escort, until an escort is not needed. Each parent shall provide the other complete travel itineraries as soon as reservations are made. Costs are shared as provided in the order of child support.

If a visit is occurring in the location of the children's schools, pick up and drop off shall take place at the school if possible. If not possible, pick up and drop off shall be at the father's home or convenient neutral location agreed to by the parents.

**3.12    Designation of Custodian**

The children named in this parenting plan are scheduled to reside the majority of time with the father. This parent is designated the custodian of the children solely for purposes of all other state and federal statutes which require a designation or determination of custody. This designation shall not affect either parent's rights and responsibilities under this parenting plan.

**3.13    Other**

3.13.1 Within 30 days of this order, the parents shall open an account with www.ourfamilywizard.com (or preferable counterpart) through which they will communicate except in the case of emergencies. Respondent shall pay the cost of

*Parenting Plan (PPP, PPT, PP)) - Page 5*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

the account for the first two years, after which the cost shall be shared proportionally by the parents. The children's medical appointments, school activities, and extracurricular activities shall be calendared to be accessible to both parents. Each parent shall check the account at least every 48 hours and shall promptly respond to the other if correspondence has been sent. All correspondence between the parties shall be courteous, child-centered, and succinct.

3.13.2 Each parent shall promptly provide the other with significant information regarding the welfare of the children, including physical and mental health, school performance, and extracurricular activities.

3.13.3 Neither parent may use the children directly or indirectly to gather information about or take messages to the other parent.

3.13.4 Both parents shall have access to the children's school schedule and calendar of events, to their teachers, counselors, and medical/dental professionals. Pursuant to the limitations set forth in ¶ 3.10, both parents may attend the children's school events, participate in parent/teacher conferences, be present for medical or dental appointments, and may attend other scheduled events. The parent with whom the children are residing at the time shall transport and supervise the children during the event. If the event is disrupted or a child is uncomfortable by the presence of both parents at the event, the non-residential parent shall leave immediately.

3.13.5 The children shall be able to initiate telephone contact with a parent at any time, provided it does not interfere with the child's or the family's existing obligations. The mother may initiate telephone or screen (electronic, computer, or Skype-like) contact with the children no more frequently than every 48 hours, although email or text messages are not limited. On school days, telephone or screen contact should occur only after school or evenings when the children do not have other events or obligations, and should not continue beyond one hour before the child's bedtime. Such contact shall be limited to no more than 1 hour per visit on school days or 2 hours per visit on non-school days. The father may enforce reasonable limits on the children's screen time in his parental discretion. The children should have a comfortable, private space with adequate reception to use when engaging in telephone or other screen/electronic contact with the mother.

3.13.6 Neither parent shall disparage or criticize the other, or allow others to do so, in the children's presence or so that they may overhear. Neither parent shall criticize the other parent's parenting styles or skills to the children or encourage the children to defy rules set in the other parent's household or by other authority figures supervising the children (*e.g.*, teachers, medical providers, etc.).

3.13.7 Father, step-mother, and the children should begin family therapy with one of these therapists, or someone similarly qualified: Kathy Gildea, LMFT, 425-830-8168, Kim Gilliland, LMFT (425) 922-1644. Emily Coil, CMHC, 425-221-3960; or David Montgomery, 425-827-5095. The primary issues to be addressed in counseling are the children's feelings surrounding the parenting arrangements and

*Parenting Plan (PPP, PPT, PP)) - Page 6*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

1  how to improve communication between all parties. After a minimum of six sessions, the father shall determine whether and how therapy shall continue for the family or individually, based on the therapist's recommendations and the desires expressed by the children.

2

3

4  3.13.8 Father shall hold the children's passports. The mother may not apply for passports or other international travel documents for the children without the father's express written permission. If the mother will be away from her residence with the children for more than one overnight, she must provide the father with an itinerary, including location and contact information, at least 7 days in advance. If either parent intends to travel with the children out of his/her state of residence, he/she must provide the other with an itinerary, including location and contact information, at least 14 days in advance. The mother may not travel internationally with the children without the father's express written permission. Any request to do so must be initiated at least 30 days in advance of the requested travel dates. If the father intends to travel with the children internationally, he must provide the mother with an itinerary, including location and contact information, at least 14 days in advance.

5

6

7

8

9

10

11  3.13.9 If the children so desire, the father shall enroll them in a Chinese language study program with an instructor approved by the mother.

12  3.13.10 Jurisdiction over parenting and child support issues shall remain in King County, Washington.

13

14  3.14   **Summary of RCW 26.09.430 - .480, Regarding Relocation of a Child**

This is a summary only. For the full text, please see RCW 26.09.430 through 26.09.480.

15

16  If the person with whom the child resides a majority of the time plans to move, that person shall give notice to every person entitled to court ordered time with the child.

17

18  If the move is outside the child's school district, the relocating person must give notice by personal service or by mail requiring a return receipt. This notice must be at least 60 days before the intended move. If the relocating person could not have known about the move in time to give 60 days' notice, that person must give notice within 5 days after learning of the move. The notice must contain the information required in RCW 26.09.440. See also form DRPSCU 07.0500, (Notice of Intended Relocation of A Child).

19

20

21

22  If the move is within the same school district, the relocating person must provide actual notice by any reasonable means. A person entitled to time with the child may not object to the move but may ask for modification under RCW 26.09.260.

23

24  Notice may be delayed for 21 days if the relocating person is entering a domestic violence shelter or is moving to avoid a clear, immediate and unreasonable risk to health and safety.

25

*Parenting Plan (PPP, PPT, PP)) - Page 7*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

If information is protected under a court order or the address confidentiality program, it may be withheld from the notice.

A relocating person may ask the court to waive any notice requirements that may put the health and safety of a person or a child at risk.

Failure to give the required notice may be grounds for sanctions, including contempt.

**If no objection is filed within 30 days after service of the notice of intended relocation, the relocation will be permitted and the proposed revised residential schedule may be confirmed.**
A person entitled to time with a child under a court order can file an objection to the child's relocation whether or not he or she received proper notice.

An objection may be filed by using the mandatory pattern form WPF DRPSCU 07.0700, (Objection to Relocation/Petition for Modification of Custody Decree/Parenting Plan/Residential Schedule). The objection must be served on all persons entitled to time with the child.

The relocating person shall not move the child during the time for objection unless: (a) the delayed notice provisions apply; or (b) a court order allows the move.

If the objecting person schedules a hearing for a date within 15 days of timely service of the objection, the relocating person shall not move the child before the hearing unless there is a clear, immediate and unreasonable risk to the health or safety of a person or a child.

## IV. Decision Making

**4.1    Day-to-Day Decisions**

Each parent shall make decisions regarding the day-to-day care and control of each child while the child is residing with that parent. Regardless of the allocation of decision making in this parenting plan, either parent may make emergency decisions affecting the health or safety of the children.

**4.2    Major Decisions**

Major decisions regarding each child shall be made as follows:

| | |
|---|---|
| Education decisions | Father* |
| Non-emergency health care | Father* |
| Extracurricular activities | Father* |
| Religious upbringing | Each parent may engage in the religious activity of his/her choice when the children reside with that parent. |

*Parenting Plan (PPP, PPT, PP)) - Page 8*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

*The father should discuss and solicit input from the mother before making major (non-routine) decisions in these areas. The father may not financially obligate the mother to an activity requiring her to pay more than $100 per month without her agreement.

**4.3     Restrictions in Decision Making**

Sole decision making shall be ordered to the respondent for the following reasons:

Restrictions imposed in ¶ 2.2.

One parent is opposed to mutual decision making, and such opposition is reasonably based on the following criteria:

(a)     The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(4)(a);

(b)     Whether the parents have demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(4)(a); and

(c)     The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

## V.  Dispute Resolution

No dispute resolution process, except court action, is ordered. The parties may agree and are encouraged to mediate or arbitrate disputes before court action.

## VI.  Other Provisions

There are the following other provisions:

<u>Notification of Contact Information</u>. Both parents shall keep the other advised of his/her residential and work addresses and telephone numbers. Neither parent shall telephone or send mail to the other at his or her work place except in the case of an emergency with a child.

## VII.  Declaration for Proposed Parenting Plan

Does not apply.

## VIII.  Order by the Court

It is ordered, adjudged and decreed that the parenting plan set forth above is adopted and approved as an order of this court.

*Parenting Plan (PPP, PPT, PP)) - Page 9*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

1  WARNING: Violation of residential provisions of this order with actual knowledge of its
   terms is punishable by contempt of court and may be a criminal offense under RCW
2  9A.40.060(2) or 9A.40.070(2).  Violation of this order may subject a violator to arrest.

3  When mutual decision making is designated but cannot be achieved, the parties shall
   make a good faith effort to resolve the issue through the dispute resolution process.

4  If a parent fails to comply with a provision of this plan, the other parent's obligations
   under the plan are not affected.

5

6

7  Dated:  December  8, 2014.

8                                                    Judith H. Ramseyer, Judge

9  Receipt acknowledged.                    Receipt acknowledged.
10     E-mail / U.S. Mail                       E-mail / U.S. Mail
       Date:  12/8/14                           Date:  12/8/14
11 Kristilyn Reese, WSBA #38938             Terry Zundel, WSBA #22109
   Of Sakaguchi & Reese, PLLC              Attorney for Petitioner
12 Attorneys for Respondent
       Copy sent via                           Copy sent via
13     E-mail / U.S. Mail                       E-mail / U.S. Mail
       Date:  12/8/14                           Date:  12/8/14
14 David Cook, Respondent                   Faye Hsin-I Ku, Petitioner

15

16

17

18

19

20

21

22

23

24

25

*Parenting Plan (PPP, PPT, PP)) - Page 10*
*WPF DR 01.0400 Mandatory (6/2008) - RCW 26.09.016,*
*.181; .187; .194*

# Exhibit 2

Dear David,

The children and I are safe among friends. Please do not send strangers who can only make life more dangerous for us. Think carefully – no one else knows us or cares about us. A policeman was called by a father to stop his son, who "stole" his car to go buy cigarettes. The son was shot dead. http://www.ryot.org/father-reports-van-son-stole-truck-teach-lesson-cops-shoot-dead/460433

Anything you have been doing towards that end is generally unforgivable, but you still have this one chance at redemption. Take it -- do your grieving, as we have been doing for the past three years, and let us be safe now.

You watch movies, but you don't learn anything from these stories. Watch again Star Trek and this time pay attention to Darth Vader. Watch the Godfather and pay attention to Don Corleone. Watch the Sound of Music and notice the father. Watch the Lego Movie and notice who the villain was. At all times, the children in these movies love their fathers and wish for them to make a simple change – to stop trying to control them. All they want is the freedom to do what is natural for children. Why did the senior at International School wish to shoot up the school this year and get arrested right before Valentine's Day? Will the school or the parents or society take any responsibility for the oppression that resulted in this boy's mental state? I guess the way things are done is to haul the boy away to "corrections", instead of ever apologizing to him for all the years of torture he has been put through already. I'm sure the school already said, One Bad Apple, caught him, no problems here, we're still the best of the best! Cue the fanfare... There is a lot of emphasis on personal responsibility and none at all on societal illness.

If the children are ever in need or in want, they know how to find you. They are always a phone call and a flight away from you. If they do not call or fly to you, it is because you have created a situation that doesn't allow them to do so in a safe way. Their safety includes the safety of their mother and brother, can you understand that? Everything you do, just because you CAN do it, doesn't mean that you SHOULD. I have told you already that it's not about the judgment of a court. It will always be about the judgment of the children. There is nothing you can do to stop them from wanting to be with their little brother and me, that doesn't create an oppressive prison around them. That is dangerous to their psychological well-being, and it must be stopped. What were you going to do when Sage could drive? Call the police on him if he decides to drive away from you with Isaac?

Be well, take care of yourself and your wife, and the children will be back when they dare. We will ask our lawyer friends to check when it will be safe to return. It is your job now to make it as safe for us as possible, and we will be watching. If you continue down this path of destruction, it will only end in more tears for everyone, and something unforgiveable may happen.

Faye

Dear Richard,

Thank you for everything you have done for me and the boys. You have been the father that we needed when my father was too far away and unable to help us. Thank you and be well.

Please sell as many of my things as you can and keep the money as payment for rent through at least November, to satisfy my lease. I have left you a full and complete power of attorney to take care of anything you need to. You may delegate this authority to someone else, if you like. I left a little cash in the bank and my bank accounts to allow you to pay the utilities. It might be good to leave them under my name, since I have low-income status and lower payments. You may also keep anything that might be useful to you in any way, like the color laser printer. Anything left over can be donated to Goodwill. They even accept broken items.

A few items I would like to give to friends or family as follows:

Guzheng, boxes of divorce papers, and photos or memorabilia – my Mom, Helen Yeh ████████ or ████████ & my piano music

Any house items that Chihfang might like for her new home, including the piano – Chihfang

All Chinese language items for kids – Jimmy Fei ████████ or ████████

Any toys or games that Joshua and Elijah might enjoy – Gladys and Annabelle

Any tools that might be useful for Conrad -- Conrad

Please sell or keep jewelry for cash at Amber Jewelers (suggestion for best price – do whatever you like), except for pieces that I wish to return to my stepmom for my sisters. The two items on top of the nightstand, please hold it for – Gail Ku ████████ or ████████ The rest are in the bottom drawer of the nightstand.

All my phone numbers and information are in the phone and would be nice to keep the photos on my laptop. Please give those to my Mom, Helen Yeh, when you no longer need them.

Please cancel my phone plans with T-mobile immediately, so charges do not continue accruing. Chihfang's phone number is also on my plan, so she should get it separated from mine first. There should be two lines for me and the boys and one for Chihfang. Also to Cancel - AAA Insurance

Thanks,


Faye Ku

Dear Mom,

I know it doesn't seem like it sometimes, but I do love you

Love,

Faye

Dear Mom and Dad,

I know it doesn't seem like it sometimes, but I do love you.

Love,

Faye